# IN THE MATTER OF THE CITATION OF RICHARD J. KINLEIN

[No. 642, September Term, 1971.]

*Decided July 3, 1972.*

626

The cause was argued before MURPHY, C. J., and MORTON, ORTH, CARTER and GILBERT, JJ.

*William W. Greenhalgh* for appellant.

*Raymond J. Kane, Jr., Special Attorney,* with whom was *Francis B. Burch, Attorney General,* on the brief, for appellee.

ORTH, J., delivered the opinion of the Court.

RICHARD J. KINLEIN, the State's Attorney for Howard County, was held to be in contempt by a two judge panel presiding in the Circuit Court for Howard County for the reason that he violated an order of that court prohibiting counsel participating in the criminal cause of *State of Maryland v. H. Rap Brown,* pending

before it, from making "any extrajudicial statement which is or tends to be prejudicial to a fair trial." [1] He was fined $350 and costs. He appealed. We affirm the judgment.

I

The case against Brown originated in Dorchester County. A true bill returned by the Grand Jury for that county was filed in the Circuit Court there on 14 August 1967. The indictment, signed by William B. Yates, II, the State's Attorney for Dorchester County, consisted of three counts charging Brown with crimes committed on or about 24 July 1967. It presented by the first count that he "* * * feloniously, wilfully and maliciously did set fire to and burn, and cause to be burned, and aid, counsel and procure the burning of the Pine Street Elementary School * * *", by the second count that he did riot, and by the third count that he did incite to riot. The case was removed for trial to the Circuit Court for Harford County by order of 17 July 1968 (Mace, J.). By order of 18 March 1970 (Dyer, J.), it was removed to the Circuit

1. The order, issued 23 March 1970, read:
"(a) Counsel participating in the pending case, their associates, assistants, staff members, investigators and employees under their supervision and control, shall not make any extra-judicial statement which is or tends to be prejudicial to a fair trial of the pending case, and shall not release any document, exhibit or other evidentiary matter which has not yet been admitted in evidence, and shall not make any comment with regard to proposed prosecution or defense tactics, or any matter of substance relating thereto, until such time as a verdict is returned in such case in Open Court.
(b) The restrictions and prohibitions set forth in section (a) shall apply with equal force to all Court attaches, employees of the Officer of the Clerk of Court, law enforcement officers (stationed in or in the immediate vicinity of the Court House), witnesses and Jurors in the pending case, until such time as a verdict is rendered in such case in Open Court.
(c) The restrictions and prohibitions set forth in section (a) shall not prohibit any witness in the pending case from discussing any matter connected with it with any counsel, whether representing the defendant or the State, or any duly authorized representative of such counsel."

628

Court for Howard County. On 23 March 1970 the Circuit Court for Howard County issued the order with which we are here concerned. On 21 April there was a hearing on a motion challenging the sufficiency of the indictment. The motion was granted as to that part of the first count which alleged that Brown aided, counseled and procured the burning. It was denied as to the remainder of the first count and as to the second and third counts.

On 14 January 1971 the Montgomery County Sentinel, a weekly newspaper published in Montgomery County, Maryland, carried a news article under the byline of its reporter, Bob Woodward, in which were extensive quotations attributed to Kinlein about the Brown case, Yates and William H. Kunstler, an attorney representing Brown. Woodward had called Kinlein on 6 or 7 January to find out if Brown's bail had been forfeited because Brown had not been seen since 7 March 1970. Kinlein suggested Woodward call Yates, the chief prosecutor in the case. In a lengthy conversation Yates filled Woodward in "on some of the background on the bond, and the case, and what the charges were, and what happened and some of the dates." During this conversation Yates was reported as saying, "I held the felony count to get him on the FBI Most Wanted List." Woodward was "astounded and confused. I did not know the significance of it * * *." Woodward called Kinlein and asked him what Yates meant. What Kinlein said was set out in the news article. He told Woodward that Yates had privately admitted the arson charge was "developed" in the event Brown skipped. Kinlein was "surprised" that Yates was now admitting the arson fabrication to the press. Kinlein said: "The fabrication of the arson charge is deplorable . . . a complete perversion of the system. * * * Yates is an ass and you can quote me." The article read, "Eastern Shore Bail Bond Service which is not licensed by the State put up $10,000 for Brown. John T. Moton is the bondsman. His 1970 Cadillac and a motel which is mortgaged 'to the hilt' have a judgment placed on them for the $10,000 bond, according to Kinlein. The judgment

on the Cadillac and motel was made in Kinlein's Howard County. The money would go to Dorchester County according to Kinlein who suspects it has not been collected because 'I got the impression Yates and Moton (the bondsman) are in cahoots.' " [2] Yates had mentioned that Kunstler "created the violence by his conduct." Kinlein said, "I agree that Kunstler helped the violence, and Yates threw gasoline on it. Kunstler is a polished grandstander, and Yates is an incompetent grandstander." The article continued: "Suggesting that Yates stood for some sort of counter-revolution, Kinlein said that, 'The counter-revolution is as dangerous as the revolution'. * * * Kinlein said that the charges against Brown were the only case he had seen in nine years which he would rather defend than prosecute. Besides the arson charge, Kinlein said that inciting a riot is part of the 'phony indictment.' "

As a result of the Sentinel article Brown moved to dismiss the arson charge. There was an evidentiary hearing on the motion on 7 and 8 May 1971, Macgill, C. J. The court denied the motion.

On 2 July 1971 the Circuit Court for Howard County ordered that Kinlein show cause why he should not be adjudged in contempt of court because the remarks made by him "are, or tend to be, prejudicial to a fair trial of the said pending case and were made in violation of the prohibition laid upon him by the said order of this Court." The remarks designated by the order were "* * * certain statements to the effect that William B. Yates, State's Attorney for Dorchester County, who had drawn the indictment in said case, had admitted that he had 'fabricated' a certain count in the indictment, and that 'the fabrication of the arson charge is deplorable . . . a complete perversion of the system'; and that he, Richard J. Kinlein, would rather defend than prosecute the case,

---

2. The article set out an explanation by Yates. "Yates estimated that Moton, 'a loyal and good bondsman', handles 80 per cent of the bond work in his county. 'He is working for us, and we try to keep up good relations with him', explained Yates who is not going to seek the money."

and that the charge in said indictment of inciting a riot was a part of the 'phony indictment' * * *." On 20 August Kinlein filed an "Affidavit of Defense". He moved the dismissal of the citation in the Affidavit of Defense and by a separate motion.

At a hearing on 30 August 1971, a two judge court, Evans, J., and Melvin, J., ruled that the Affidavit of Defense was insufficient in law [3] and denied the motions to dismiss the citation. It also heard and denied a motion for a jury trial. The citation was heard on the merits on 18 and 19 October. On 20 October the court found that Kinlein was "guilty of contempt of Court for violation" of the order of 23 March 1970 and sentence was imposed.

## II

Ordinarily when there are restrictions imposed by a court on the uttering and publishing of extra-judicial statements relating to a pending case the ultimate question is whether the application of them violates the right to freedom of speech. Then the constitutional prohibition against abridging the freedom of speech and the constitutional guarantee of a fair trial are in opposition. The problem of conflict in such circumstances between the two constitutional rights has been solved in this jurisdiction by the adoption of the clear and present danger doctrine, with its concomitant requirement of establishing prejudice, set out in *Baltimore Radio Show, Inc. v. State,* 193 Md. 300, as the constitutional test. Here, however, Kinlein makes no claim that his freedom of speech was abridged by the order; he presents no question of freedom of speech vis-a-vis a fair trial.[4] Thus there is

---

3. This ruling was predicated upon *Grohman v. State,* 258 Md. 552, in which the Court of Appeals said, at 565, in regard to the defense of purgation by oath:

"We adopt the rejection, as did Holmes, [in *United States v. Shipp,* 203 U. S. 563] of this archaic form of defense of purgation by oath in contempt proceedings, as being a legal anachronism. In all logic and fairness the State should be allowed by competent evidence to contravene matters set forth in the affidavit filed by the defendant in such cases."

4. Kinlein recognizes that "the concept of a fair trial applies

no problem of conflict and the clear and present danger doctrine is not invoked. In this connection we are constrained to observe that we feel that the utterances of Kinlein were without the bounds of permissible free speech in any event. We do not construe the first amendment clause as affording protection to a public prosecutor's statements which are false and inflammatory, threatening the fairness of a criminal trial in which he is to participate.

In denying the motion to dismiss the indictment the lower court found the statements made by Kinlein to be false in material aspect. A transcript of the proceedings of that hearing is included in the record before us, filed as defendant's exhibit No. 1. The question before the hearing judge was whether the arson count in the indictment returned against Brown "should be dismissed on the ground it was a fabricated charge and was made simply for the purpose of bringing the FBI into the case in the event that the defendant should not show up for trial." The judge found the evidence insufficient to warrant the relief prayed. He made factual findings. He found that the evidence did not show that Yates "ever said that he had fabricated the charge of arson for the purpose stated or for any purpose." He found that the words "fabricated" and "phony" were used by Kinlein in talking to Woodward. He found that the arson charge left in the indictment had not been "fabricated" by Yates. He said:

"It is difficult for me to believe, gentlemen, Mr. Kinlein's version of what was said; if he had heard the extraordinary announcement which he said that he had heard, he has given, so far as I am aware, no reasonable explanation

both to the prosecution and the defense." We indicated in *Goldsborough v. State,* 12 Md. App. 346, at 357, that the state has a right to a fair trial. And the Supreme Court said in *Wade v. Hunter,* 336 U. S. 684, 689 that the public has an interest "in fair trials designed to end in just judgments." We think it clear that the concept of a fair trial extends both to the prosecution and the defense.

as to why he nursed this knowledge of an admission of an unlawful thing for such a long time, without confronting Mr. Yates with it, or divulging it to Mr. Garrity [Assistant Attorney General] or to any member of the Office of the Attorney General, or to the Court. When he did announce it, it was mentioned to a representative of the county newspaper in an adjoining county in the course of answering an inquiry about the forfeiture of a bail bond. I cannot speculate and will not speculate as to the reason or impulse which led to these circumstances."

At the contempt hearing Kinlein, testifying in his own behalf, admitted making, in substance, the statements as reported in the newspaper article. And on cross-examination he said that to the best of his "recollection, knowledge and belief" the words Woodward attributed to him were accurate. But he admitted that Yates never told him he had "fabricated" the count, or that he had "developed" the count, or that the indictment was "phony." Kinlein said he used those words because he thought they were "descriptive * * * of what had transpired."

In reviewing the judgment we "have the duty to make an independent evaluation of the circumstances." *Sheppard v. Maxwell,* 384 U. S. 333, 362. When a claim of a constitutionally protected right is involved, we must make an independent examination of the whole record, that is, an independent constitutional appraisal. *State v. Hamilton,* 14 Md. App. 582, 592; *Herbert v. State,* 10 Md. App. 279, 287; *Gardner v. State,* 10 Md. App. 233, 245. We have made an independent evaluation of the circumstances from the entire record before us. We are in full accord with the findings of the judge at the hearing on the motion to dismiss and have not the slightest difficulty in concluding that the statements were false in material aspect. They were also inflammatory. Kinlein himself

recognized their inflammatory characteristics. Testifying at the contempt hearing he said he had not discussed what he thought was information exculpatory to Brown with the court, with Brown's counsel, with the Attorney General, or with his colleagues in the local office of the State's Attorney before making the statements to the press. He said he had kept the information to himself because "the atmosphere in the court, in the community, was such that to volunteer such a statement, that is, that what I've said here, in this manner or any other manner, would have been inflammatory * * *." We have no greater difficulty in determining on our independent constitutional appraisal that the statements threatened the fairness of the trial. By the very nature of the utterances, false and inflammatory as they were, we think there was a reasonable likelihood that they would prevent a fair trial.[5]

## III

Kinlein attacks the constitutionality of the order on two grounds. The first ground goes to the issuance of the order. He contends that "the record did not contain sufficient specific findings to pass such a blanket prohibition" and urges us to rule that an evidentiary hearing of record is required as a matter of law before such an order may issue. Absent such a hearing he would have the order be invalid on its face. The second ground goes to the content of the order. He asserts the order is "indefinite, uncertain, and non-specific in its terms." He gives for reason that the "import" of the words "prejudicial to a fair trial of the pending case" is "lacking in any ascertainable standard of proscribed conduct until voir dire at the trial itself." He also questions the evidence, alleging that it was insufficient "to prove the gravamen of the offense" and his "willfulness." Finally he con-

5. The two panel court at the contempt hearing found "beyond a reasonable doubt, and to a moral certainty, that the words that were uttered, by their common meaning, inherently and on their face, * * * at least tend to prejudice a fair trial in this case. That is, a fair trial as to the State."

tends that the hearing court committed two errors, each of which requires reversal, in denying him his constitutional right to a jury trial and his constitutional right to equal protection of the laws.

In arguing his contentions Kinlein has fossicked opinions of the Supreme Court and state and federal courts throughout the United States. The opinions of the Supreme Court, when apposite, are, of course, binding upon us. But we are not compelled to follow principles or rules of law enunciated by courts of other jurisdictions and we are not persuaded to follow those to which he refers us, even when on point, finding them in the main not in accordance with our views and the law of this State. We do not believe that the questions presented are as complicated, or the issues raised as complex, or the problems considered as knotty, as it appears from his arguments Kinlein would have them, but we will deal with the points he presents as we construe them.[6]

### (a)

In attacking the constitutionality of the order on the ground that there was no pre-issuance evidentiary hearing of record establishing its necessity, Kinlein accepts as "well established that 'the courts must take such steps by rule and regulation that will protect their processes from prejudicial outside interferences,' *Sheppard v. Maxwell,* 384 U. S. 333, 363 (1965)." But he finds not well settled "The manner in which a trial judge may effectuate this mandate of the Supreme Court consonant with the Constitution of the United States." We think it is a matter within the sound discretion of the trial court. The Supreme Court said in *Estes v. Texas,* 381 U. S. 532, 540-541: "We have always held that the atmosphere essential to the preservation of a fair trial—the most fundamental of all freedoms—must be maintained at all costs. Our approach has been through rules, contempt proceed-

---

6. Kinlein "contends that the threshhold procedural issue for this Court to decide is whether [he] may challenge the validity of the order he violated." Without deciding the point, we assume for the purpose of decision that he may.

ings and reversal of convictions obtained under unfair conditions." In *Sheppard* many of the prejudicial news items could be traced to the prosecution as well as the defense. The Court said that effective control of these sources was "concededly within the court's power * * *. More specifically, the trial court might well have proscribed extrajudicial statements by any lawyer, party, witness, or court official which divulges prejudicial matters * * *." 384 U. S. at 361. It set out practical measures to be taken "where there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial," and stated, "If publicity during the proceedings threatens the fairness of the trial, a new trial should be ordered." At 363. It continued:

> "But we must remember that reversals are but palliatives; the cure lies in those remedial measures that will prevent the prejudice at its inception. The courts must take such steps by rule and regulation that will protect their processes from prejudicial outside interferences. Neither prosecutors, counsel for defense, the accused, witnesses, court staff nor enforcement officers coming under the jurisdiction of the court should be permitted to frustrate its function. Collaboration between counsel and the press as to information affecting the fairness of a criminal trial is not only subject to regulation, but is highly censurable and worthy of disciplinary measures."

In *Baltimore Radio Show, Inc. v. State, supra*, where our Court of Appeals reversed judgments against three broadcasting companies and an individual obtained in criminal contempt proceedings because broadcasts violating a restrictive order of the Supreme Bench of Baltimore City did not create such a clear and present danger to a fair trial as required by the constitutional test which it adopted and applied, it carefully pointed out: "We do not suggest that the courts lack the traditional

power to discipline officials who are part of the administration of justice," noting that the question whether the courts can now deal with persons in cases "where the statements are inflammatory, false, or designed to intimidate, is not before us." 193 Md. at 331.[7] We are inclined to follow the guidelines of *Sheppard,* be they dictum or no. The court below had the power and, under *Sheppard,* the duty, to take action to proscribe matters which threatened the fairness of the pending trial.[8] We reject Kinlein's claim that an evidentiary hearing of record was a constitutional requisite to the validity of the order. He relies on four cases. In *United States v. Tijerina,* 412 F. 2d 661 (10th Cir. 1969), a hearing was held with counsel present for all parties at which the problem of pretrial publicity was discussed. The court stated its intent to make a restrictive order, furnished counsel copies of a proposed order, and later entered the order without any objection made. The order covered the attorneys, the defendants and the witnesses. Two defendants were cited for violating the order and convicted of criminal contempt. *Hamilton v. Municipal Court for the Berkeley-Albany Judicial District,* 76 Cal. Rptr. 168 concerned a writ of prohibition to prevent prosecution for wilful disobedience of a pretrial order prohibiting discussion of the merits of prosecution for committing a public nuisance and unlawfully occupying college buildings. The order

7. In *Baltimore Radio Show* the broadcasts did not contain false, argumentative, or inflammatory statements but were factual, being accurate reports of statements made or verified by public authorities.

8. It appears that Kinlein does not question that the source of the power to punish for contempt is inherent in a court and does not deny the inherent power of the court here to punish for contempt. The power of the court to punish for contempt "* * * is a common-law power possessed, independently of statute, by our courts of constitutional origin." *Ex parte Sturm,* 152 Md. 114, 120. "The power and authority to punish contempts is one of common law origin and has existed in courts of law and equity since ancient times. It is an inherent right and not dependent upon legislative authority, and relates to criminal, as well as civil, contempts, and to direct and indirect contempts alike. It is a power reposed in courts of civil, as well as criminal jurisdiction." *In Re Lee,* 170 Md. 43, 46. See *Goldsborough v. State, supra,* at 357, and cases therein cited.

was issued at a pretrial hearing. *In the Matter of Oliver,* 452 F. 2d 111 (7th Cir. 1971), involved a policy statement by a court and an American Bar Association Canon. The order was not issued in a particular case and, of course, there was no pretrial hearing. *Chase v. Robson,* 435 F. 2d 1059 (7th Cir. 1970), arose from a *sua sponte* order prohibiting defendants and their attorneys from making any public statements in relation to a pending criminal case. It was held in *Tijerina* that the order did not violate the defendant's rights of free speech. The order in *Hamilton* was held to be justified. In *Oliver* the policy of court was declared null and void as violative of the first amendment. In *Chase* the order was stricken as constitutionally impermissible. Kinlein concludes that since the orders in the two cases lacking pretrial hearings were voided, the determinative factor was the hearing. We do not see the cases that way. In *Tijerina* the court found that the order was based on a "reasonable likelihood" of prejudicial news which would make difficult the impaneling of an impartial jury and tend to prevent a fair trial. It believed that "reasonable likelihood" sufficed. 412 F. 2d at 666. In *Hamilton* the court thought the order valid because it met constitutional standards which require such an order "to be formulated with narrow specificity so as to meet the particular evil sought to be regulated." 76 Cal. Rptr. at 172. The ruling in *Oliver* was predicated upon the fact that the policy adopted by the lower court contained a blanket prohibition against all extrajudicial comment by counsel in all pending cases whether tried before judge or jury without regard to whether such comment is or even could be prejudicial to the fair administration of justice. Such a policy could not stand, said the court, without making a mockery of the free speech guaranty of the first amendment. 452 F. 2d at 114-115. *Oliver* relied on *Chase.* In *Chase* there was some support for the order in the recommendations of the Committee on the Operation of the Jury System of the Judicial System of the United States, 45 F.R.D. 391, 401-407 (1969). But even in criminal cases tried before a

jury, as in *Chase,* the committee limited its suggestion prohibiting dissemination of information to situations where "there is a reasonable likelihood that such dissemination will * * * prejudice the due administration of justice." Id., at 404. The court felt that the order, "whether approached on its individual bases or construed as a whole, is devoid of sufficient findings as to satisfy either the 'clear and present danger' or 'reasonable likelihood' tests of a 'serious and imminent threat to the administration of justice.' " It also found the order as written and applied unconstitutionally overbroad. 435 F. 2d at 1061. Even if we were bound by the rulings in *Tijerina, Hamilton, Oliver* or *Chase,* we do not construe those opinions as concluding that an evidentiary hearing is required before a prohibiting order can validly issue.

We have concluded that the issuance of the order was in the sound discretion of the trial court. We now look to the exercise of that discretion. Brown was nationally known and his counsel, William H. Kunstler, had a national reputation; the case, by its nature and by the figures concerned with it, was extremely newsworthy. Kinlein, himself, as pointed out above, recognized the inflammatory nature of the community with respect to the trial. He said in his Affidavit of Defense: "[Y]our affiant was aware at the time of the notoriety of the case and the intense emotionalism exhibited in the comments made publicly by several persons including, but not limited to the principal counsel for the State and the representatives of the Defendant, and also including a comment made by the Honorable Harry E. Dyer, Associate Judge of the Third Judicial Circuit, apparently recognizing the deficiencies in the State's case, which public comment which was nationally televised had precipitated the removal of the case to Howard County." The case had been twice removed for trial. We think that the order was a proper remedial measure taken by the lower court to prevent prejudice to a fair trial. The order sought only to have issues judicially determined in open court, on competent evidence, rather than by the com-

munity upon the basis of information supplied by partisans and carried by the news media. The order applied to those persons before the court and subject to its proper orders. We see no abuse of judicial discretion in the issuance of the order in the circumstances.

### (b)

We do not agree that the order was "indefinite, uncertain and non-specific in its terms" and "lacking in any ascertainable standard of proscribed conduct." It specified the persons affected, the time it was to be in effect, and the conduct forbidden. We feel that the language of the order conveyed sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices, see *Kirstel v. State*, 13 Md. App. 482, 487-488, particularly when considered in the light of those persons affected. Certainly to counsel and their associates, trained and experienced in the law or supervised by those who were, the prohibition against making a statement "which is or tends to be prejudicial to a fair trial of the pending case" is not so vague that they must necessarily guess at the meaning and differ as to its application. Nor do we agree that the proscribed conduct is ascertainable only upon examination of the jury at the trial itself.[9] We point out that what is proscribed

---

9. We note that Kinlein does not discuss the effect under his reasoning had Brown waived a trial by jury and elected a trial by the court. It may be that he would argue that in that event no violation of the order could be prejudicial to a fair trial. However, in *Baltimore Radio Show, Inc. v. State, supra,* concerned, as we are here, with the violation of a pretrial restrictive order, it was suggested that the Supreme Court, "which has not hesitated to extend the constitutional protection to procedural due process, might take a different view where juries or potential juries are concerned, rather than trial judges." The Court said flatly, at 325:

> "The distinction is hardly tenable. Judges are not so 'angelic' as to render them immune to human influences calculated to affect the rest of mankind. Conversely, while juries represent a cross-section of the community, it cannot be denied that in every community there are citizens who by training and character are capable of the same firmness and impartiality as the judiciary. It is plainly a matter of degree."

Compare *State v. Hutchinson,* 260 Md. 227 and *State v. Babb,* 258 Md. 547 in which the Court appears to take a different view regarding judges vis-a-vis juries. And further compare those cases with *Gill v. State,* 265 Md. 350.

is not only that which "is" prejudicial but also that which "tends to be" prejudicial. We construe this to mean to have a reasonable likelihood of being prejudicial and this can be established other than at the time of trial. We are not bound to the contrary by *Irvin v. Dowd*, 366 U. S. 717, relied on by Kinlein, for we do not believe it to be apposite. It is true that in *Irvin* the method used in determining whether or not the trial was fair was by voir dire but *Irvin* was a habeas corpus proceeding brought to test the validity of the petitioner's conviction of murder and sentence of death. The question was the propriety of the denial of a change of venue due to alleged partiality of the jury. The rationale of the decision to vacate the judgment is apparent from these words of the opinion: "With his life at stake, it is not requiring too much that petitioner be tried in an atmosphere undisturbed by so huge a wave of public passion and by a jury other than one in which two-thirds of the members admit, before hearing any testimony, to possessing a belief in his guilt." At 728. This is not to say that it is only after it has been shown at voir dire of the prospective jury that a fair trial is unlikely because of community prejudice that a judgment can be made whether or not a violation of a pretrial order prohibiting statements which are or tend to be prejudicial to a fair trial is actionable against a lawyer participating in the case.

We hold that the order here was not constitutionally void.

(c)

Kinlein does not dispute that he made the statements ascribed to him, that they were made at a time when *State v. Brown* was pending in the Circuit Court for Howard County, and that they were published in the Montgomery County Sentinel. Nor does he now deny knowledge of the order he was found to have violated. But he argues that the evidence was deficient because it did not establish actual prejudice to a fair trial. We do not feel that the State was required to show actual prejudice to a fair trial in the circumstances here or, as we

have indicated, even that the statements constituted a clear and present danger to a fair trial because they were without the ambit of permissible free speech. We think it enough if they threatened the fairness of the trial or, in other words, had a reasonable likelihood of preventing a fair trial. We believe it plain that statements made in violation of a court order by one of the prosecutors in the case to the effect that the State's Attorney drawing the indictment admitted that he had fabricated the arson charge, that the fabrication was deplorable—a complete perversion of the system, that he would rather defend than prosecute the case, that the charge of inciting to riot was a part of the phony indictment, and which in material part were false, had a reasonable likelihood of prejudicing the State's case. The two panel court at the contempt hearing found "beyond a reasonable doubt, and to a moral certainty, that the words that were uttered, by their common meaning, inherently and on their face, * * * at least tend to prejudice a fair trial in this case. That is, a fair trial as to the State." We are in accord with those findings.

We see no merit whatsoever in the claim that the judgment must be reversed because "the element of willfulness was neither alleged nor proved beyond a reasonable doubt." Kinlein argues that the evidence had to show that he willfully attempted to prejudice a fair trial. But all that was required here was that the statements which had a reasonable likelihood of preventing a fair trial were willfully made in violation of the court's order. And this Kinlein does not dispute. Lack of intent to prejudice the fairness of the trial may go to mitigation of punishment but not to the commission of the act of contempt. See *Ex Parte Bowles*, 164 Md. 318. Good faith is not determinative where, as here, the act comprising the alleged contempt is plainly contemptuous on its face. *Goldsborough v. State*, 12 Md. App. 346.

It may well be, Kinlein's denials and the feeling of the hearing court to the contrary notwithstanding, that the evidence was sufficient in law to establish that Kinlein

made the statements in a deliberate attempt to prejudice the pending case. The lower court was "sure" that Kinlein did not make the statements "with any intention of trying to deny the State a fair trial or prejudice the State's case," feeling, however, that the "best of intentions" would not be a defense in any event. On our independent evaluation of the entire record it would seem that the evidence did not lend itself to such assurance. Kinlein testified that normally in such a situation he would have entered a nolle prosequi to the counts he suspected but was unable to do so in the circumstances here, obviously because he was not in complete control of the case coming, as it did, to his jurisdiction by removal. He declared that "I was upset and disgusted by the fact that Mr. Yates would not only do what he did, but now reveal it." In the light of his testimony his sworn assertions in the Affidavit of Defense are most revealing. He said, after admitting he made the statement, and emphatically denying all the while any improper motives, that "* * * the overwhelming requirement of justice was to publicly corroborate Mr. Yates' admission of the purpose of the arson charge and to denounce this type of personal and political prosecution. * * *." It was his intention "* * * to guarantee that the Defendant, along with all others, be afforded his right to a fair and impartial trial on just and real charges substantially based. * * *." He insisted that the comments made by him tended to "* * * aid and assist the Court by assuring that no person shall be brought by the State before the bar of justice on charges lacking real and substantial supporting evidence." These assertions, coming as they did after the findings of the court in the hearing on the motion to dismiss the indictment, appear, despite the denials, to indicate Kinlein entertained a deliberate attempt to prejudice at least a part of the State's case.

We hold that the evidence was sufficient in law to sustain the finding that Kinlein was contemptuous.

### (d)

Kinlein declares that he had a right to be tried by a

jury and claims that the denial thereof was error. His motion for a jury trial, filed 20 August 1971, was opposed by the State and denied by the court upon hearing on 30 August 1971. On 18 October when the case came on for trial the motion was renewed and again denied. We see no error.

Kinlein is aware of the ruling of *In Re Martin,* 10 Md. App. 385, but urges that we not "consider yielding to the temptation of relying" thereon as dispositive of the point. He would have us adopt the view of *Baker v. City of Fairbanks,* 471 P. 2d 386 (S. Ct. Alaska, 1970). We are not persuaded to do so. We do not share the view of the Supreme Court of Alaska that there is a compelling need to extend the standards of the Supreme Court of the United States as to the right of a jury trial. We shall not depart from *Martin* and in adhering to it as dispositive of the point here we are not "yielding to the temptation of relying on" it but affirming the propriety of its rulings.[10]

We find no merit in Kinlein's other arguments on the point. We do not think he was denied due process by the absence of a jury trial because the evidence with respect to his character may have created a reasonable doubt of his guilt in the minds of a jury, or because the Attorney General stated he thought Kinlein should have been held in contempt of court and was going to review the matter

---

**10.** In *Martin* we held there is no federal constitutional right to a jury trial in a criminal case, including cases of criminal contempt, where the offense charged is a "petty" one, i.e., an offense punishable by not more than six months imprisonment and a $500 fine. As no maximum penalty is set for contempt, a court may hear the case without a jury provided it does not impose a penalty in excess of six months and a $500 fine. See *Frank v. United States,* 395 U. S. 147; *Williams v. Florida,* 399 U. S. 78; *Baldwin v. New York,* 399 U. S. 66; *Dyke v. Taylor Instrument Co.,* 391 U. S. 216; *Bloom v. Illinois,* 391 U. S. 194; *Duncan v. Louisiana,* 391 U. S. 145; *Cheff v. Schnackenberg,* 384 U. S. 373. See also *Staten v. State,* 13 Md. App. 425.

In *Martin* we also considered, as Kinlein asks us to do here, the possible impact on the individual of a sentence of six months or less as a guidepost by which to determine, for constitutional purposes, whether an offense is a petty one. We were not persuaded then to adopt that criterion, 10 Md. App. at 388, and we are not persuaded now.

in the light of the constitutional mandate with respect to impeachment, so making "the uncertainty of the Attorney General's future action towards removal * * * a factor this Court should consider as to whether appellant should have had a jury trial," or because the two judges comprising the panel were appointed to hear the proceeding by the Chief Judge of their circuit who had issued the contempt citation. Nor do we find that the record, as Kinlein suggests, "substantially raises the probability of predisposition, which is tantamount to the probability of unfairness." We find these arguments to be without the substance to indicate, much less compel, reversal. We point out that the Court of Appeals has observed that the "assumed proposition that judges are men of discernment, learned and experienced in the law and capable of evaluating the materiality of evidence, lies at the very core of our judicial system." *State v. Babb,* 258 Md. 547, quoted in *State v. Hutchinson,* 260 Md. 227, 237.

We find no error in the denial of the motion for a trial by jury.

(e)

Kinlein contends that the lower court erred in rejecting his "offer of proof that proceedings in Harford County surrounding the trial of H. Rap Brown would be admissible to show that [he] was denied the equal protection of the laws of the fourteenth amendment of the constitution of the United States." He explains the contention by harking back to when the Brown case was within the jurisdiction of the Circuit Court for Harford County.

"Judge Dyer passed an order against pre-trial publicity in the H. Rap Brown case * * *. He violated his own order * * *. Mr. Yates accused him of unethical conduct * * *. The case is then ordered removed by Judge Dyer to Howard County * * *. No one was cited for contempt * * *. Appellant offered to prove these

> events * * *. Since Mr. Yates has already quali-
> fiedly acknowledged three instances of extra-
> judicial statements subsequent to Chief Judge
> Macgill's Order of March 23, 1970 * * *, pro-
> ceedings in Harford County were essential to
> develop a continuing pattern of discrimination."
> (References to the transcript of the proceedings
> below are omitted)

He relies for support of his contention on a dissenting opinion in *People v. Darcy,* 59 Cal. App. 2d 342, 139 P. 2d 118. Aside from the fact that the majority opinion in *Darcy* is contrary to his claim, we find that our Court of Appeals has resolved the point against him. In *Drews v. State,* 236 Md. 349, not cited by him, it was contended that the failure of the State to prosecute others for the same or similar offenses was a denial of due process or equal protection of the laws. The Court found that the contention was without merit and had no bearing on the conviction before it. "Guilt or innocence cannot be made to depend on the question of whether other parties have not been prosecuted for similar acts. * * * Nor is the exercise of some selectivity in the enforcement of a criminal statute, absent a showing of unjustifiable discrimination, violative of constitution guarantees. * * *." (citations omitted). At 354. We think that the rationale of *Drews* is as properly applicable to an act amounting to a criminal contempt as to an act which is the commission of a crime.[11] *Drews* is dispositive of the issue.

> *Judgment affirmed; appellant*
> *to pay costs.*

---

11. For a discussion of criminal contempt see *Roll v. State,* 15 Md. App. 31.